**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

MARIO ROSALES,

      Plaintiff - Appellant,

v.

DAVID BRADSHAW, in his individual
and official capacity; SHERIFF BRITT
SNYDER, in his individual and official
capacity,

      Defendants - Appellees.

No. 22-2027

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:20-CV-00751-DHU-JHR)**
_____

Marie Miller (Patrick Jaicomo and Anya Bidwell, with her on the briefs), of Institute for Justice, Arlington, Virginia, for Plaintiff-Appellant.

Daniel J. Macke of Macke Law & Policy, LLC, Albuquerque, New Mexico, for Defendant-Appellee David Bradshaw.

Brandon Huss and David A. Roman of The New Mexico Association of Counties, Santa Fe, New Mexico, for Defendant-Appellee Britt Snyder.
_____

Before **HARTZ**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

This case arose from events involving David Bradshaw, a sheriff's deputy who was off duty, out of uniform, and driving his personal vehicle with his child in the front passenger seat. After a vehicle being driven by Mario Rosales legally passed Bradshaw, Bradshaw decided to follow Rosales. He then declined backup assistance from another deputy, followed Rosales all the way home, blocked Rosales in his driveway, and began shouting and yelling at Rosales, all before identifying himself as law enforcement. In response, Rosales became afraid and exited his vehicle with a legal and openly carried gun in his pants pocket, intending to protect himself and his property but also to deescalate the situation. Bradshaw, however, continued to shout and pointed his gun at Rosales. Though Rosales feared being shot, he remained calm and nonthreatening throughout the encounter. When Bradshaw eventually identified himself as law enforcement and told Rosales to put his gun back in his vehicle, Rosales complied, and the encounter wound down from there. As a result of this incident, Bradshaw's employment was terminated, and he was convicted in state court of aggravated assault and child endangerment.

Rosales then filed this action under 42 U.S.C. § 1983, alleging in part that Bradshaw violated his Fourth Amendment right to be free from unreasonable seizures. The district court granted Bradshaw's motion to dismiss, ruling that he was entitled to qualified immunity because he did not violate clearly established law when he unreasonably pointed his gun at Rosales. The critical distinguishing fact, for the district court, was that Rosales was armed.

We reverse. Under the facts as alleged in the complaint, Bradshaw violated Rosales's constitutional right to be free from unreasonable seizures, and his egregious and unlawful conduct was obviously unconstitutional. Bradshaw is therefore not entitled to qualified immunity, and Rosales's § 1983 claim against him may proceed.

Rosales also sued Britt Snyder, the sheriff at the time of the incident. The district court dismissed the claims against Snyder in an order drafted by Snyder's counsel that Rosales's counsel expressly agreed to. That order did not accurately reflect the parties' agreement to dismiss the claims without prejudice so that Rosales could seek leave to file an amended complaint naming the correct party in place of Snyder. But we nevertheless affirm Snyder's dismissal based on our conclusion that Rosales waived his challenge to that ruling when his counsel expressly agreed to the order dismissing his claims against Snyder with prejudice.

## Background

According to Rosales's first amended complaint, he was driving home in Chaves County, New Mexico, on March 18, 2018, when he decided to pass a pickup truck.[1] The pickup belonged to Bradshaw, an off-duty, out-of-uniform sheriff's deputy. In response to being legally passed and with his child in the front passenger seat, Bradshaw decided to follow Rosales. Having noticed that he was being followed by an unmarked pickup truck, Rosales made a series of turns without signaling to confirm as much; the pickup

---

[1] Because this is an appeal from an order granting a motion to dismiss, we accept the facts in the complaint as true and view them in the light most favorable to Rosales. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

continued to follow him.

While he was following Rosales, Bradshaw called a fellow sheriff's deputy and asked her to run Rosales's license plate. Based on this check, the deputy informed Bradshaw that Rosales appeared to be heading home. Bradshaw told the deputy "he did not want her to go to his location," but the deputy ignored that instruction "because she knew Bradshaw had a volatile temper." App. vol. 1, 27. The deputy therefore proceeded to Rosales's residence based on her "gut feeling" about Bradshaw's volatility. *Id.* at 28.

When Rosales arrived at his residence, he parked in his driveway and remained in his car. Bradshaw arrived immediately thereafter and blocked the driveway with his pickup. Having been followed to his residence and blocked in by an unknown vehicle, Rosales was afraid, so he placed his legally possessed gun in his pants pocket, openly displaying the weapon as he exited the vehicle. "Bradshaw immediately started yelling and cursing at . . . Rosales in a loud, threatening, and abusive manner." *Id.* "Rosales attempted to speak reasonably with Bradshaw," but Bradshaw continued yelling. *Id.*

Bradshaw then commented on Rosales's gun, "and Rosales explained . . . that New Mexico is an open[-]carry state," that "he simply was exercising his rights[,] and that he was on his own private property." *Id.* "[W]hile remaining in his driveway and while keeping his hands clear of his firearm, [Rosales] walked a little closer to . . . Bradshaw's truck in an attempt to talk in a normal tone of voice." *Id.* Bradshaw identified himself as a law-enforcement officer, threatened Rosales with a reckless-driving citation, and said he had contacted another officer. At some point during this exchange, Bradshaw pulled out a gun, held it in his hand, and "point[ed] it at Rosales in a threatening manner."

*Id.* at 29.

"Shortly after" Bradshaw pointed his gun at Rosales and "while Rosales was still trying to reason with [Bradshaw], the wind blew Rosales'[s] shirt over his firearm." *Id.* "As soon as that happened, Bradshaw yelled, 'now that's concealed carry' and purposefully raised his gun at Rosales in a manner that made him fear he was about to be shot." *Id.* "Rosales immediately put his hands in the air and backed away from Bradshaw." *Id.* As he did so, Rosales noticed the child in the passenger seat of Bradshaw's pickup. Rosales continued trying to reason with Bradshaw, and Bradshaw replied that they could talk after Rosales put his gun back in the vehicle. Rosales complied.

Bradshaw then exited his pickup, "wearing a long sleeve t-shirt, shorts, and flip flops, none of which displayed [sheriff's office] insignia." *Id.* Bradshaw continued speaking over Rosales, asked for his license, and asked if he had been drinking; Rosales replied that he did not drink. Bradshaw's fellow deputy then arrived and told Bradshaw he could leave. Neither the deputy nor Bradshaw gave Rosales a citation. Bradshaw's employment was terminated as a result of this incident, and he "was eventually charged and convicted of aggravated assault and . . . [c]hild [e]ndangerment." *Id.* at 31.

Based on these events, Rosales filed this civil-rights action in state court, naming Bradshaw and Snyder as defendants in their individual and official capacities and

asserting both federal and state-law claims.[2] In addition to detailing the events just described, Rosales alleged that Snyder hired Bradshaw despite knowing he "had a history of abusive behavior as a police officer and had been forced out of his prior employment within law enforcement." *Id.* Rosales further alleged that Bradshaw's "explosive temper" was well-known around the sheriff's office, that Snyder "provided no special training or supervision over Bradshaw," and that Snyder should not have retained Bradshaw as an employee. *Id.* Snyder's acts and omissions, Rosales alleged, "manifest[ed] a deliberate indifference to [his] constitutional rights . . . , rendering [Snyder] liable for Bradshaw's unconstitutional actions against Rosales." *Id.* at 32.

Snyder removed the action to federal district court, and Bradshaw moved to dismiss. After conducting a hearing, the district court entered a short order concluding that although Bradshaw violated Rosales's constitutional rights, Bradshaw was nevertheless entitled to qualified immunity because, given that Rosales was armed, the unconstitutionality of Bradshaw's conduct was not clearly established. Approximately seven months later, the district court entered a substantially longer order explaining these rulings.

Snyder also moved to dismiss, arguing that qualified immunity barred the individual-capacity claims; that the official-capacity claims failed because he was no longer the sheriff and the proper party for such claims was the Board; and that the statute

---

[2] The district court later allowed the Board of County Commissioners of Chavez County to intervene both permissively and by right. Because the district court dismissed Rosales's claims, however, the Board is not a party to this appeal.

of limitations barred the state-law claims. During the hearing on this motion, Rosales's counsel conceded that the individual-capacity claims against Snyder failed because there was no "analogous case that would satisfy" the need for clearly established law in the qualified-immunity context.[3] App. vol. 2, 313. But he argued that "the official[-]capacity claim . . . still is viable, except that [Snyder] has now left his position. So there needs to be a substitution." *Id.* at 315. He requested an "opportunity to file a motion to amend to name the [Board]." *Id.* at 314.

The district court then asked Rosales's counsel if he was "agreeing that [Snyder's] motion [to dismiss] should be granted." *Id.* at 316. Rosales's counsel replied, "Yes, Your Honor. I think so. I think at this time that's an appropriate motion." *Id.* So the district court, with the parties' consent, instructed Snyder's counsel to prepare an order granting Snyder's motion for the parties to sign off on. Rosales's counsel again stated that he intended to file a request to amend with an attached proposed second amended complaint. But when the district court entered the order a few days later—an order drafted by Snyder's counsel that Rosales's counsel agreed to—it dismissed all claims against Snyder with prejudice. And Rosales's counsel never attempted to set aside the order or sought leave to file a second amended complaint. The district court later entered final judgment, dismissing Rosales's federal claims and remanding his state-law claims to state court.

Rosales appeals.[4]

---

[3] Rosales does not pursue the individual-capacity claims against Snyder on appeal.

[4] We have jurisdiction over this appeal even though some state-law claims remain pending in state court. *See Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1209

## Analysis

Rosales asks us to reverse the district court's dismissal of his claims against Bradshaw and Snyder. We take each defendant in turn.

## I.      Excessive-Force Claim Against Bradshaw

Rosales argues that the district court erred in dismissing his § 1983 claim against Bradshaw on the basis that Bradshaw was entitled to qualified immunity. Section 1983 allows an individual to seek damages from state officials who have violated that individual's constitutional rights. But qualified immunity protects state officials from such lawsuits when "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Thus, Bradshaw's "assertion of qualified immunity creates a presumption that [he is] immune from suit."[5] *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). And to

---

& n.1 (10th Cir. 2000) ("Federal appeals courts have consistently held . . . that they have jurisdiction to review a district[-]court order dismissing federal claims on the merits where the district court subsequently exercised its discretion under [28 U.S.C.] § 1367 to remand supplemental state[-]law claims to state court.").

[5] Rosales argues that Bradshaw is not eligible to assert a qualified-immunity defense because he failed to first establish that he was acting within the scope of his discretionary authority as a sheriff's deputy (an inquiry Rosales contends should include consideration of state law). But Rosales forfeited this argument by failing to raise it below and waived it on appeal by failing to argue for plain error. *See Richison v. Ernest Grp. Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011). Moreover, Rosales states that his position is foreclosed by binding circuit precedent, and he merely seeks to "preserve[] this issue for review by the en banc [c]ourt or the Supreme Court." Aplt. Br. 24. We therefore do not consider it further.

overcome this presumption at the motion-to-dismiss stage, Rosales must show—based on the allegations in his complaint—that Bradshaw "violated a federal statutory or constitutional right" and that "the unlawfulness of [his] conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (explaining that when defendant asserts qualified immunity on the pleadings, court will assess "defendant's conduct *as alleged in the complaint*"). As the district court did, we take each of these two prongs in turn. *See Pearson*, 555 U.S. at 236 (explaining that although courts need not consider these two prongs in any particular order, "it is often beneficial" to first assess constitutional violation before considering clearly established law).

### A.      Constitutional Violation

Rosales defends—and Bradshaw attacks—the district court's conclusion that Bradshaw violated Rosales's Fourth Amendment right to be free from unreasonable seizures. Determining whether a seizure is reasonable requires balancing "the nature and quality of the intrusion . . . against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The reasonableness of an officer's use of force in effectuating a seizure turns on "the factual circumstances of every case," *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001), and "depends on not only when a seizure is made, but also how it is carried out," *Garner*, 471 U.S. at 8. The relevant factors—which we refer to as the *Graham* factors—"include [1] the crime's severity, [2] the potential threat

9

posed by the suspect to the officer's and others' safety, and [3] the suspect's attempts to resist or evade arrest." *Gross*, 245 F.3d at 1158 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

### 1.   First and Third *Graham* Factors: Severity of the Suspected Crime and the Suspect's Attempts to Resist or Evade Arrest

Here, the first and third *Graham* factors are not meaningfully disputed, and both favor Rosales. As for the severity of the crime, recall that the complaint alleges Rosales decided to pass Bradshaw, Bradshaw decided to follow Rosales, and Rosales then made several turns without signaling to confirm he was being followed by an unknown and unmarked vehicle. Rosales correctly points out that the allegation that he "decided to pass Bradshaw," App. vol. 1, 27, construed in his favor, requires an inference that he did so legally, *see* N.M. Stat. Ann. § 66-7-310 (explaining rules for "the overtaking and passing of vehicles"). But Rosales's complaint further alleges that he "made a series of turns without using his turn signal." App. vol. 1, 27. And he acknowledges on appeal that he "could have been suspected [of] a failure to use turn signals." Aplt. Br. 28. So at most, Bradshaw suspected Rosales of committing a petty misdemeanor (either failing to signal or reckless driving). *See* N.M. Stat. Ann. § 66-7-325 (requiring drivers to signal before turning); *id.* § 66-8-113 (describing reckless driving as driving "without due caution and circumspection"); *id.* § 66-8-7 (designating violations of New Mexico traffic laws as misdemeanors punishable by not more than 90 days' imprisonment); *id.* § 30-1-6(C) (defining "petty misdemeanor" as offense punishable by six months or less in prison); *State v. Trevizo*, 257 P.3d 978, 982 (N.M. Ct. App. 2011) (holding that New Mexico

offense of reckless driving is petty misdemeanor). As for Rosales's attempts to resist or flee, nothing in the complaint suggests that Rosales did anything of the sort; on the contrary, the complaint alleges that Rosales calmly complied with the commands Bradshaw issued after he eventually identified himself as a law-enforcement officer. These two *Graham* factors therefore easily weigh in Rosales's favor and against Bradshaw's use of force, as the district court concluded. *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (noting that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest").

### 2.  Second *Graham* Factor: Whether the Suspect Posed an Immediate Threat

This factor is "undoubtedly the 'most important' and fact intensive." *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (quoting *Pauly v. White* (*Pauly III*), 874 F.3d 1197, 1215–16 (10th Cir. 2017)). We assess the threat posed by an armed suspect using another set of nonexclusive factors, including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). In addition to these *Larsen* factors, we consider the extent to which an officer's reckless conduct prior to the use of force during the seizure provoked the suspect's actions. *See Pauly III*, 874 F.3d at 1219–20 (noting that "reasonableness of the use of force depends not only on whether the officers were in danger at the precise

moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force'" (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004))).

a.    ***Larsen* Factors**

We agree with the district court that all but one of the *Larsen* factors favor Rosales. To be sure, the complaint establishes that Rosales was not far away from Bradshaw and that the gun he carried in his pants pocket could have fired across such distance. *See Larsen*, 511 F.3d at 1260 (noting factor of "distance separating the officers and the suspect"). This weighs in Bradshaw's favor. *See Palacios v. Fortuna*, 61 F.4th 1248, 1260 (10th Cir. 2023) (weighing this factor in favor of officers where suspect was armed and distance between them was 15 to 20 feet). But the complaint also makes clear that Rosales complied with the commands Bradshaw issued—including the command to put the gun away—after Bradshaw eventually identified himself as an officer. *See Larsen*, 511 F.3d at 1260 (noting factor of "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands"). This clearly supports Rosales. *Cf. id.* (weighing this factor in officers' favor where suspect "refused to cooperate with the officers' repeated orders to drop his weapon"); *Palacios*, 61 F.4th at 1259 (weighing this factor in officers' favor where suspect "received many verbal commands and warnings to drop his weapon and had at least three clear opportunities to do so" but "instead maintain[ed] possession").

And importantly, Rosales made absolutely no hostile motions with his gun towards Bradshaw. *See Larsen*, 511 F.3d at 1260 (noting "hostile motions . . . made with

the weapon towards the officers" as relevant factor). Rather, he "ke[pt] his hands clear of his firearm," and when Bradshaw pointed his gun, Rosales "put his hands in the air" while "back[ing] away from Bradshaw." App. vol. 1, 28–29. Indeed, we recently held that the hostile-motion *Larsen* factor weighed against finding an immediate threat of harm where a complaint alleged that the plaintiff—who exited his house at the request of individuals he reasonably doubted were law-enforcement officers—was "carrying a gun in the low-ready position to protect himself as he walked around his house late at night to see who it was that wanted him to come outside and talk." *St. George v. City of Lakewood*, No. 20-1259, 2021 WL 3700918, at *7 (10th Cir. Aug. 20, 2021) (unpublished).[6] In so doing, we noted that "there is a fundamental distinction between mere *possession* of a weapon and *hostile movements* with it." *Id.* at *6. That same distinction is at play here, where the complaint alleges that Rosales was armed but not at all hostile. *Cf. Palacios*, 61 F.4th at 1259–60 (weighing hostile-motion factor in officers' favor where suspect "brought his hands to the front of his body immediately after [officers] watched him pick up a gun for the third time"); *Arnold v. City of Olathe*, 35 F.4th 778, 792 (10th Cir. 2022) (weighing this factor in officers' favor where suspect "waved the weapon in the direction of the officers").

Just as importantly, the complaint's allegations support the conclusion that a reasonable officer would have known Rosales's "manifest intentions" were to protect himself and his home, to deescalate the situation, and not to cause harm. *Larsen*, 511 F.3d

---

[6] We find this unpublished case persuasive. *See* 10th Cir. R. 32.1(A).

at 1260. In particular, the complaint establishes that Rosales armed himself only for self-protection because he was afraid after an unknown pickup truck followed him home and blocked him in his driveway. *See Pauly III*, 874 F.3d at 1219 (finding plaintiffs' "manifest intention . . . was to protect their home from ostensible home invaders" where officers could reasonably conclude that plaintiffs reasonably believed that officers who approached at night without clearly identifying themselves were not law enforcement); *St. George*, 2021 WL 3700918, at *7 (noting that plaintiff "manifested only an intent to protect himself from unknown intruders, not to harm police officers"); *cf. Palacios*, 61 F.4th at 1260 (concluding that reasonable officer would view suspect's manifest intentions as dangerous where suspect "had at least three clear opportunities to leave his gun and instead continued to pick it up and maintain it in his hand"). In addition, Rosales alleges that he sought to deescalate the situation by "attempt[ing] to speak reasonably with Bradshaw," explaining the legal basis for openly carrying his gun, and trying "to talk in a normal tone of voice" despite Bradshaw's yelling. App. vol. 1, 28–29. As the district court pointed out, Rosales's complaint alleged that he "stayed calm throughout the encounter even though Bradshaw . . . escalated the situation" and that Rosales "acted cautiously and reasonably" the entire time. *Id.* at 268–69. Thus, three of the four *Larsen* factors strongly support the conclusion that Rosales did not pose an immediate threat to Bradshaw.

### b.     Bradshaw's Reckless and Deliberate Conduct

Although the balance of the *Larsen* factors is sufficient to ultimately weigh the second *Graham* factor in Rosales's favor, we also note that the complaint's allegations

show that Bradshaw's own reckless and deliberate conduct—deciding to initially follow Rosales in an unknown and unmarked vehicle for no law-enforcement reason, declining backup assistance, following Rosales all the way home and blocking him in his driveway, and shouting and yelling at Rosales without identifying himself as law enforcement— precipitated Rosales's decision to arm himself. *See Pauly III*, 874 F.3d at 1219–20 (noting that reckless and deliberate conduct of officers can be part of overall reasonableness analysis). As Rosales puts it, a reasonable "officer in [Bradshaw's] shoes (or, rather, his flip-flops)" would have understood "that [Rosales] had a perfectly reasonable explanation for possessing a firearm—to lawfully deter a violent attack on him and his family, at their home, by a[] . . . stranger who, by all appearances, was not a police officer." Aplt. Br. 31. Thus, even if we were to assume that Rosales's openly displayed weapon, on its own, perhaps *suggested* an immediate threat, that suggestion is undercut by Bradshaw's reckless and deliberate creation of this threat. *See Pauly III*, 874 F.3d at 1221–22 (reasoning "the threat made by the [suspects], which would normally justify an officer's use of force, was precipitated by the officers' own actions" such that the second *Graham* factor did not "weigh conclusively in favor of [o]fficer").

### 3.    Bradshaw's Counterarguments

Against this analysis pointing strongly toward a constitutional violation, Bradshaw offers little to persuade us otherwise. Notably, he fails to expressly discuss Rosales's allegations in light of the *Graham* factors or the *Larsen* factors. Instead, he broadly argues that Rosales posed an immediate threat because he was "an armed and approaching citizen." Bradshaw Br. 2. Yet this assertion is flawed in at least two respects.

First, it's wholly untethered from the *Larsen* factors that guide our immediate-threat inquiry. Second, it fails to appreciate that we must accept the allegations in the complaint as true and construe all reasonable inferences in Rosales's favor. *See Behrens*, 516 U.S. at 309. Though the complaint does say that Rosales was armed, the allegations therein do not support the inference that a reasonable officer could conclude Rosales posed an immediate threat because he was "approaching" or "continued to approach." Bradshaw Br. 2, 8. As the district court determined, "the well-pleaded facts reasonably support the [opposite] inference[:] that Rosales was no longer, in fact, approaching Bradshaw's truck when Bradshaw decided to draw his weapon." App. vol. 1, 268 n.30. Indeed, the complaint alleges only that Rosales "walked a little closer to . . . Bradshaw's truck in an attempt to talk in a normal tone of voice." *Id.* at 28.

Additionally, Bradshaw's focus on Rosales's gun ignores other critical allegations—that Rosales "ke[pt] his hands clear of his firearm" and that Bradshaw's own reckless and deliberate conduct precipitated Rosales's decision to arm himself in the first place. *Id.* On the latter point, the complaint specifically alleges that an unmarked and unknown vehicle began following Rosales for no law-enforcement reason, ultimately followed him all the way home, and then blocked him into his driveway; "Rosales became afraid to exit his vehicle[,] and before he did so, he grabbed his handgun from his car and tucked the barrel of his handgun in his pants pocket[,] leaving the handle of the gun visible and openly displayed." *Id.* Bradshaw nowhere engages with these allegations or with the legal authorities establishing that an officer's reckless and deliberate actions "immediately connected to [a suspect] arming themselves[,] . . . should be included in the

reasonableness inquiry." *Pauly III*, 874 F.3d at 1221; *see also, e.g.*, *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) ("In addition to considering whether the officers reasonably believed they were in danger at the time they used force, we have considered 'whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" (alteration in original) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997))). In sum, no reasonable officer could have concluded, on the facts alleged, that Rosales posed an immediate threat based solely on his legally possessed and openly displayed weapon, which he was carrying only in response to that officer's own reckless and deliberate conduct. *See St. George*, 2021 WL 3700918, at *7–8 (finding that no officer could have reasonably believed plaintiff posed threat of immediate harm because even though plaintiff "was close enough . . . to pose a significant threat with his shotgun, no officer had come forward to identify himself or herself . . . and [plaintiff] made no hostile motions or manifested any intention to harm an officer").

Continuing his focus on Rosales's gun, Bradshaw distinguishes the facts here from those in *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001). There, officers executing a search warrant held various family members, including children, at gunpoint, and we stated that "continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation" could constitute a Fourth Amendment violation. *Id.* at 1193. Bradshaw contends that, by contrast, no constitutional violation occurred here because he only briefly pointed his gun at Rosales and did not continue to do so after Rosales placed his own gun back into his vehicle. But *Holland*'s

17

constitutional-violation holding did not turn exclusively on the length of time a gun was pointed. Rather, we said "the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force" and therefore "should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Id.* at 1192. We further clarified that any pointing of a firearm—whether initial or continuing—must be predicated on a perceived risk of harm. As a result, Bradshaw's purported brevity in holding Rosales at gunpoint does not preclude a finding that Bradshaw unreasonably seized Rosales in violation of his Fourth Amendment rights.

Nor is such a finding precluded by the fact that Rosales is not a child.[7] To be sure, we noted in *Holland* that "[p]ointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances." *Id.* at 1193. But *Holland*'s overall discussion was not limited to children; it discussed general principles about the pointing of firearms and then applied those general principles to the pointing of firearms at children. *See id.* at 1192–93. Moreover, we have relied on *Holland* to deny qualified immunity when officers pointed their guns at adults *and* children. *See Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1313–14 (10th Cir. 2015) (holding that summary-judgment record could support conclusion that officers used excessive force when seizing adults and children by "point[ing] loaded guns directly

---

[7] On this point, we pause to note that there *was* a child involved in the facts of this case: The complaint alleges that a child was sitting in the passenger seat of Bradshaw's pickup during these events.

at them . . . despite their full compliance with the officers' orders"); *see also Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) ("[T]he unreasonableness of the gun-pointing is more apparent in these cases [involving children], though pointing a gun at a compliant adult in a non[]threatening situation, as in this case, can also constitute excessive force."). Thus, we reject Bradshaw's argument that *Holland*'s constitutional-violation holding is limited to children.

In sum, because all three *Graham* factors favor Rosales, we agree with the district court that Bradshaw's use of force when seizing Rosales was unreasonable and unconstitutional. *See Davis v. Clifford*, 825 F.3d 1131, 1136 (10th Cir. 2016) (finding unconstitutional excessive force where all three *Graham* factors favored plaintiff).

### B.     Clearly Established Law

Next, Rosales argues (as he must, to prevail in the face of Bradshaw's assertion of qualified immunity) that his right to be free from unreasonable seizures under the circumstances alleged here was clearly established. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 577 U.S. at 11–12 (quoting *Reichle*, 566 U.S. at 664). Stated differently, it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 138 S. Ct. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Or, in yet another formulation, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

19

Although "[a] Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right," *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), "[t]here can also be 'the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances,'" *Truman v. Orem City*, 1 F.4th 1227, 1235–36 (10th Cir. 2021) (quoting *Wesby*, 138 S. Ct. at 590). "After all, some things are so obviously unlawful that they don't require detailed explanation[,] and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)); *see also id.* at 1211 ("[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." (quoting *Browder*, 787 F.3d at 1082–83)). Thus, qualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional. *See Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam).

Cases featuring obvious constitutional violations typically involve unlawful conduct that is "obviously egregious." *Truman*, 1 F.4th at 1240 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). For instance, we have previously found obviously unconstitutional conduct where a prosecutor fabricated evidence, *id.*; where an officer arrested a man based on unsubstantiated double-hearsay, *Cortez v. McCauley*, 478 F.3d 1108, 1117–22 (10th Cir. 2007); and where an officer, without warning, beat and

tased a nonviolent misdemeanant who neither resisted nor attempted to flee and was "peacefully attempting to return to the courthouse with a file he should not have removed," *Casey*, 509 F.3d at 1285. And the Supreme Court has held it obviously unconstitutional to house a prisoner in extremely unsanitary cells for six days. *Taylor*, 141 S. Ct. at 53.

Here, the district court determined that Bradshaw's conduct was not obviously unconstitutional, but we disagree. Though the outcome of Bradshaw's conduct was perhaps ultimately less traumatic than a wrongful conviction or physical injuries, that was only because Rosales responded calmly and reasonably to Bradshaw's actions. And such an outcome, fortunate as it was, does not change the egregious nature of Bradshaw's obviously unconstitutional conduct. Under the alleged facts, Bradshaw—who was off-duty, dressed in civilian clothing, driving his personal vehicle, and had his child in the front passenger seat—decided to follow Rosales for no law-enforcement purpose after Rosales legally passed him, declined backup assistance, ultimately followed Rosales all the way home, blocked Rosales in his own driveway, began yelling aggressively at Rosales, and then pointed a gun at Rosales. And construing the complaint in Rosales's favor, Bradshaw did all this prior to identifying himself as a law-enforcement officer and without provocation or suspicion of anything more than minor traffic violations that Rosales committed only after Bradshaw decided to follow him in the first place. Moreover, after initially "holding" his firearm and "pointing it at Rosales in a threatening manner," Bradshaw then "purposefully raised his gun at Rosales in a manner that made [Rosales] fear he was about to be shot" solely in response to the wind blowing Rosales's

shirt over the gun in his pocket. App. vol. 1, 29. But no reasonable officer would perceive *the wind* as an escalation of the threat or as a justification for an increased use of force, particularly where Rosales kept his hands away from the gun in his pocket. In short, the complaint shows an officer acting recklessly and deliberately in violation of Rosales's constitutional rights.

Indeed, recall that the complaint alleges this incident resulted in Bradshaw's state criminal conviction for aggravated assault against Rosales. We accept that allegation as true for purposes of this appeal, and we can therefore also draw all reasonable inferences from that allegation in Rosales's favor. *See Smith*, 561 F.3d at 1098. Under New Mexico law, aggravated assault can consist of "unlawfully assaulting or striking at another with a deadly weapon." N.M. Stat. Ann. § 30-3-2(A). "Unlawfulness" is an element of aggravated assault that courts interpret to mean "without lawful justification or excuse"— for example, not done for a law-enforcement purpose. *State v. Johnson*, 930 P.2d 1148, 1155 (N.M. 1996) (quoting *State v. Parish*, 878 P.2d 988, 991 (N.M. 1994)); *see also* N.M. Unif. Jury Instr. Crim. 14-132. Additionally, New Mexico courts interpret aggravated assault to require "general criminal intent," which is "more than an intentional act" and is instead "a mental state of conscious wrongdoing." *State v. Cruz*, 525 P.2d 382, 384 (N.M. Ct. App. 1974). So the jury that convicted Bradshaw necessarily found no law-enforcement purpose and a mental state of conscious wrongdoing.

"'[M]alicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate.' Qualified immunity 'exists to protect mistaken but reasonable decisions, not purposeful criminal conduct.'" *Rodriguez v. Swartz*, 899 F.3d

719, 734 (9th Cir. 2018) (footnote omitted) (quoting *Hardwick v. County of Orange*, 844 F.3d 1112, 1119 (9th Cir. 2017)), *judgment vacated on other grounds*, 140 S. Ct. 1258 (2020). In *Rodriguez*, for instance, the Ninth Circuit found an obvious constitutional violation where the complaint alleged that a United States border-patrol agent, without warning or provocation, fatally shot a teenager walking peacefully on the Mexican side of the border. *Id.* at 727. The government had indicted and tried the officer for murder. *Id.* at 734. Although a jury acquitted the officer of murder and hung on manslaughter, at the time of the Ninth Circuit's ruling, the government planned to retry the officer for manslaughter. *Id.* at 734 & n.58. Given that the complaint "ma[de] a persuasive case for murder charges" and considering the government's justifiable charging, the Ninth Circuit denied qualified immunity after determining that it would have been obvious to any officer "that it was unlawful to shoot people in Mexico for no reason." *Id.* at 734; *see also Hardwick*, 844 F.3d at 1120 (finding obvious constitutional violation where social workers fabricated evidence in child-custody proceeding in violation of state statute).

Bradshaw's conviction likewise supports the conclusion that he committed an obvious constitutional violation. It should be obvious to any reasonable officer that he or she cannot commit aggravated assault, and conduct found by a jury to constitute wrongful unjustified force does not fall into the "hazy border between excessive and acceptable force." *Mullenix*, 577 U.S. at 18 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). The sheriff's department, which allegedly fired Bradshaw for this incident, also appears not to have viewed this conduct as that of a reasonable deputy. Courts can protect officers' ability to make reasonable split-second law-enforcement decisions when dealing

23

with suspected violent criminals without protecting an officer who was himself the only

violent criminal on the scene. We do not mean to suggest that every violation of law

committed in the course of a seizure renders the seizure obviously unconstitutional. *See*

*Jessop v. City of Fresno*, 936 F.3d 937, 941–42 (9th Cir. 2019) (finding no clearly

established Fourth Amendment violation where officers allegedly stole property initially

seized pursuant to lawful warrant). We simply hold that this is an extreme case in which

the criminal act inherently constitutes excessive force and is therefore obviously

unconstitutional when committed by an officer conducting a seizure.

In sum, Bradshaw's conduct was obviously unconstitutional; it would have been

"clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). Bradshaw

therefore can't claim qualified immunity to shield himself from Rosales's claims, and we

reverse the district court's order dismissing Rosales's claims against Bradshaw.

## II.    Claims Against Snyder

Rosales also argues that the district court erred in dismissing his official-capacity

claims against Snyder with prejudice. But as Snyder contends, Rosales waived any such

argument because his counsel agreed to dismiss the claims against Snyder with prejudice.

To be sure, during the hearing on Snyder's motion to dismiss, Rosales's counsel below

agreed only that the motion to dismiss should be granted without prejudice and with leave

to amend, not that the claims should be dismissed with prejudice. But the order that

Snyder's counsel drafted at the district court's direction dismissed the claims against

Snyder *with prejudice* and without any reference to amending the complaint. And despite

24

these critical inconsistencies with what the parties had agreed to and what the district court seemed to decide at the hearing, Rosales's counsel "[a]pproved" the order. App. vol. 1, 157.

Rosales now asserts that the order "at least appeared consistent with the [district court's decision" and that he only signed off on it "as to form." Rep. Br. 22–23. Yet the order was simply *not* consistent with what the parties and the district court discussed at the hearing. And Rosales fails to explain how signing off "as to form" would alert opposing counsel and the district court that the order did not accurately reflect either what he agreed to or what the district court decided.

Rosales further asserts that agreeing "as to form" is merely "what usually happens when one party wins a motion and the other loses[:] The winner drafts an order and sends it to the loser to make sure the draft reflects the court's oral ruling." *Id.* at 23 n.17. But the situation here is critically different from "what usually happens" because the proposed dismissal order drafted by the winning party *did not reflect the district court's oral ruling*. And yet Rosales's counsel raised no objection. Indeed, Rosales's counsel did more than fail to object to the proposed dismissal order. He agreed to the order, even though it plainly misstated what the parties and the district court had discussed. Further, after agreeing to the order, Rosales neither sought to set it aside nor attempted to amend his complaint. This "intentional relinquishment . . . of a known right" amounts to waiver, and we do not consider waived arguments. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991 (10th Cir. 2019) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). We therefore affirm the district court's order dismissing the claims against Snyder with

25

prejudice.[8]

## Conclusion

Because Rosales waived any challenge to the order dismissing his claims against Snyder with prejudice, we affirm that portion of the district court's judgment. But we reverse the district court's order dismissing Rosales's claims against Bradshaw. Under the facts as alleged in the complaint, Bradshaw's obviously egregious conduct violated Rosales's Fourth Amendment right to be free from unreasonable seizures, so he is not entitled to qualified immunity. We therefore affirm in part, reverse in part, and remand for further proceedings.

---

[8] That dismissal might not disadvantage Rosales as much as he contends it does. The case Rosales cites, *Benton v. Town of South Fork*, reflects only the basic rule that dismissal with prejudice prevents refiling claims against the same defendant. 587 F. App'x 447, 451 (10th Cir. 2014). But that is not what Rosales would do in amending his complaint to name the proper county defendant.

*22-2027, Rosales v. Bradshaw*

**HARTZ, J**., concurring

I am concerned that if a traditional analysis is conducted in this case—taking the actions of the officer step by step and ignoring the officer's subjective state of mind—one could be hard-pressed to conclude that Mr. Bradshaw committed a Fourth Amendment violation, much less a clearly established violation. In particular, I would think that as a general rule an officer can threaten the use of force, including aiming his weapon, to require a suspect detained on reasonable suspicion to disarm himself.

Taking a holistic view, however, it is hard to justify not imposing civil liability under § 1983 on an officer convicted of the offense of personally assaulting the plaintiff. Issue preclusion (not argued here) should establish the constitutional violation, and certainly the rationale for qualified immunity has no purchase once the officer has already been successfully prosecuted. From this perspective, I concur in the result.